DEPARTMENT OF REVENUE OF OREGON
*v.* ACF INDUSTRIES, INC., ET AL.

No. 92–74.   Argued November 8, 1993—Decided January 24, 1994

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, O'CONNOR, SCALIA, SOUTER, THOMAS, and GINSBURG, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 348.

*Virginia L. Linder*, Solicitor General of Oregon, argued the cause for petitioner. With her on the briefs were *Theodore R. Kulongoski*, Attorney General, *Thomas A. Balmer*,

Deputy Attorney General, and *Robert M. Atkinson,* Assistant Attorney General.

*Kent L. Jones* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Days, Acting Assistant Attorney General Paup, Deputy Solicitor General Wallace, Gary R. Allen, Paul M. Geier, Dale C. Andrews, S. Mark Lindsey,* and *G. Joseph King.*

*Carter G. Phillips* argued the cause for respondents. With him on the brief was *James W. McBride.**

JUSTICE KENNEDY delivered the opinion of the Court.

The power of state and local governments to impose ad valorem property taxes upon railroads and other interstate

---

*Briefs of *amici curiae* urging reversal were filed for the State of Iowa by *Bonnie J. Campbell,* Attorney General, and *C. A. Daw;* for the State of Washington et al. by *Christine O. Gregoire,* Attorney General of Washington, and by the Attorneys General for their respective States as follows: *Grant Woods* of Arizona, *Daniel E. Lungren* of California, *Robert A. Butterworth* of Florida, *Larry EchoHawk* of Idaho, *Chris Gorman* of Kentucky, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Tom Udall* of New Mexico, *Robert Abrams* of New York, *Michael F. Easley* of North Carolina, *Heidi Heitkamp* of North Dakota, *Lee Fisher* of Ohio, *Susan B. Loving* of Oklahoma, *T. Travis Medlock* of South Carolina, *Charles W. Burson* of Tennessee, *Jan Graham* of Utah, *Jeffrey L. Amestoy* of Vermont, *Stephen D. Rosenthal* of Virginia, *James E. Doyle* of Wisconsin, and *Joseph B. Meyer* of Wyoming; and for the National Conference of State Legislatures et al. by *Richard Ruda* and *Richard G. Taranto.*

*Richard A. Malm* and *Thomas W. Andrews* filed a brief for the Railway Progress Institute et al. as *amici curiae* urging affirmance.

Briefs of *amici curiae* were filed for the State of California by *Daniel E. Lungren,* Attorney General, *Timothy G. Laddish,* Assistant Attorney General, *Richard F. Finn,* Supervising Deputy Attorney General, and *Robert E. Murphy* and *Marguerite C. Stricklin,* Deputy Attorneys General; for the Association of American Railroads by *Betty Jo Christian, Timothy M. Walsh, Jerald S. Howe, Jr., Robert W. Blanchette,* and *Kenneth P. Kolson;* and for Interstate Air Carriers by *Jay R. Martin, Peter W. Davis,* and *John E. Carne.*

carriers has been the source of recurrent litigation under the Commerce Clause and the Due Process Clause. See, *e. g.*, *Central R. Co. of Pa.* v. *Pennsylvania*, 370 U. S. 607 (1962); *Braniff Airways, Inc.* v. *Nebraska Bd. of Equalization and Assessment*, 347 U. S. 590 (1954); *Morgan* v. *Parham*, 16 Wall. 471 (1873). In the case before us, a state property tax is challenged under a federal statute, the Railroad Revitalization and Regulatory Reform Act of 1976 (4–R Act). Pub. L. 94–210, 90 Stat. 31.

The question presented is whether the State of Oregon violated the statute by imposing an ad valorem tax upon railroad property while exempting various other, but not all, classes of commercial and industrial property. We hold that a State may grant exemptions from a generally applicable ad valorem property tax without subjecting the taxation of railroad property to challenge under the relevant provision of the 4–R Act, § 306(1)(d), 49 U. S. C. § 11503(b)(4).

## I

Oregon imposes an ad valorem tax upon all real and personal property within its jurisdiction, except property granted an express exemption. Ore. Rev. Stat. § 307.030 (1991). Various classes of business personal property are exempt, including agricultural machinery and equipment; nonfarm business inventories; livestock; poultry; bees; fur-bearing animals; and agricultural products in the possession of farmers. §§ 307.325, 307.400. Standing timber is also exempt, but is subject to a severance tax when harvested. § 321.272. Oregon, like many other States, exempts motor vehicles as well, instead levying upon them a modest annual registration fee. §§ 803.585, 803.420(1).

Respondents, called the "Carlines" in this litigation, are eight companies that lease railroad cars to railroads and shippers. The railroad cars are considered "tangible personal property" under Oregon law, § 307.030, and are not exempt from taxation. The Carlines brought suit in United States District Court under § 306(1)(d) of the 4–R Act, seeking de-

claratory and injunctive relief against the assessment, levy, and collection of the State's property tax upon their railroad cars.

Congress enacted the 4–R Act in part to "restore the financial stability of the railway system of the United States." § 101(a), 90 Stat. 33. When drafting the legislation, Congress was aware that the railroads "'are easy prey for State and local tax assessors' in that they are 'nonvoting, often nonresident, targets for local taxation,' who cannot easily remove themselves from the locality." *Western Air Lines, Inc.* v. *Board of Equalization of S. D.*, 480 U. S. 123, 131 (1987) (quoting S. Rep. No. 91–630, p. 3 (1969)). Section 306 of the 4–R Act, now codified at 49 U. S. C. § 11503, addresses this concern by prohibiting the States (and their subdivisions) from enacting certain taxation schemes that discriminate against railroads. See *Burlington Northern R. Co.* v. *Oklahoma Tax Comm'n*, 481 U. S. 454, 457 (1987).

The relevant provisions of § 11503 are contained in subsection (b), which states:

"The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a State may not do any of them:

"(1) assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

"(2) levy or collect a tax on an assessment that may not be made under clause (1) of this subsection.

"(3) levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

"(4) impose another tax that discriminates against a rail carrier providing transportation . . . ."

The reach of subsections (b)(1)–(3) is straightforward: These provisions forbid the imposition of higher assessment ratios or tax rates upon rail transportation property than upon "other commercial and industrial property." The scope of subsection (b)(4), which forbids the imposition of "another tax that discriminates against a rail carrier providing transportation," is not as clear.

The Carlines do not challenge Oregon's ad valorem property tax under subsections (b)(1)–(3). We attribute this choice to the fact that the State subjects all nonexempt property "to assessment and taxation in equal and ratable proportion." Ore. Rev. Stat. § 307.030 (1991). Rather, it is the Carlines' contention that Oregon's tax should be considered "another tax that discriminates against a rail carrier," in violation of subsection (b)(4), because it exempts certain classes of commercial and industrial property while taxing railroad cars in full.

The District Court, after reviewing a stipulated record, held that discriminatory property tax exemptions are subject to challenge under subsection (b)(4). On the facts presented, however, the court determined that Oregon's ad valorem property tax complied with the provision. The court observed that, in other cases, only those state taxes exempting more than 50% of nonrailroad commercial personal property had been found to contravene subsection (b)(4). See *Trailer Train Co.* v. *Leuenberger*, 885 F. 2d 415 (CA8 1988), cert. denied, 490 U. S. 1066 (1989); *Burlington Northern R. Co.* v. *Bair*, 766 F. 2d 1222 (CA8 1985). Because (according to the court's calculations) Oregon exempted only 31.4% of nonrailroad commercial personal property from taxation, the court granted judgment to the State.

The Court of Appeals reversed. 961 F. 2d 813 (CA9 1992). In accordance with Circuit precedent, see *ACF Industries, Inc.* v. *Arizona*, 714 F. 2d 93, 94 (CA9 1983), the court ac-

knowledged that subsections (b)(1)–(3) do not speak to the question of discriminatory property tax exemptions. Like the District Court, however, the Court of Appeals accepted the Carlines' contention that property tax exemptions are subject to challenge under subsection (b)(4). The court explained that Congress enacted § 11503 to "'prevent tax discrimination against railroads *in any form whatsoever.*'" 961 F. 2d, at 820 (emphasis in original) (citing *Ogilvie* v. *State Bd. of Equalization of N. D.*, 657 F. 2d 204, 210 (CA8), cert. denied, 454 U. S. 1086 (1981)).

Rejecting the District Court's apparent view that ad valorem tax schemes exempting less than 50% of nonrailroad business property are not proscribed by subsection (b)(4), the Court of Appeals held that the "most natural reading" of the provision dictates that "*any* exemption given to other taxpayers but not to railroads" is forbidden, with possible room for "a *de minimis* level of exemption[s]." 961 F. 2d, at 822 (emphasis in original). The court found that Oregon's property tax, under the calculation most generous to the State, exempted 25% of nonrailroad commercial property, far exceeding any possible *de minimis* exception. On this ground, the court concluded that the State's taxation of railroad property violated subsection (b)(4). *Id.*, at 823. Holding that the Carlines "were entitled to the same total exemption preferred property owners enjoyed," the court enjoined the State from levying any tax upon the Carlines' railroad property. *Ibid.*

We granted certiorari, 508 U. S. 905 (1993), and now reverse.

II

Before passing upon the validity of Oregon's ad valorem property tax under § 11503(b)(4), the Court of Appeals and the District Court addressed a preliminary question: Whether a tax upon railroad property is even subject to challenge under subsection (b)(4) on the ground that certain

other classes of commercial and industrial property are exempt. We consider the same question.

Both parties contend that the plain meaning of subsection (b)(4), which prohibits "another tax that discriminates against a rail carrier," dictates an answer in their favor. In the State's view, the word "another" means "different from that which precedes it." Because subsections (b)(1)–(3) address property taxes and only property taxes, it follows that the term "another tax" in subsection (b)(4) must mean "a tax different from a property tax." The State concludes that subsection (b)(4) does not speak to discriminatory property tax exemptions for the simple reason that the provision does not speak to property taxes at all.

The Carlines, like the Court of Appeals, take a different view. They understand the phrase "another tax that discriminates against a rail carrier" to be a residual category designed to reach any discriminatory state tax, including discriminatory property taxes, not covered by subsections (b)(1)–(3). It follows that property tax exemptions disfavoring railroad transportation property—exemptions the Carlines in effect admit fall outside the scope of subsections (b)(1)–(3), see Brief for Respondents 16–17—are within the ambit of subsection (b)(4). Accord, *e. g., Trailer Train Co.* v. *Leuenberger,* 885 F. 2d 415, 417–418 (CA8 1988), cert. denied, 490 U. S. 1066 (1989); *Department of Revenue of Fla.* v. *Trailer Train Co.,* 830 F. 2d 1567, 1573 (CA11 1987). If Congress had intended to exclude property taxes from the reach of subsection (b)(4), the Carlines contend, it would have drafted the provision to prohibit "any tax other than a property tax," and not phrased the statute as it did. Brief for Respondents 17.

Both the State's and the Carlines' readings are defensible if subsection (b)(4) is read in isolation, cf. *Burlington Northern R. Co.* v. *Oklahoma Tax Comm'n,* 481 U. S., at 461 (language of subsection (b)(1) "plainly declares [its] purpose"), and so we must look elsewhere to determine its meaning.

The structure of § 11503 as a whole does yield an answer, one adverse to the Carlines' challenge to Oregon's property tax. We conclude that a State may grant exemptions from a generally applicable ad valorem property tax without exposing the taxation of railroad property to invalidation under subsection (b)(4).

Subsections (b)(1)–(3) of § 11503, as noted, forbid the imposition of higher property tax rates and assessment ratios upon "rail transportation property" than upon "other commercial and industrial property." 49 U. S. C. §§ 11503(b)(1)–(3). "Commercial and industrial property," which serves as the comparison class for measuring unlawful discrimination under those provisions, is defined as "property, other than transportation property and land used primarily for agricultural purposes or timber growing, devoted to a commercial or industrial use and subject to a property tax levy." § 11503(a)(4).

The interplay between subsections (b)(1)–(3) and the definition of "commercial and industrial property" in subsection (a)(4) is central to the interpretation of subsection (b)(4). For example, the definition of "commercial and industrial property" excludes "land used primarily for agricultural purposes." The fact that Congress made this particular exclusion demonstrates its intent to permit the States to tax railroad property at a higher rate than agricultural land, notwithstanding subsection (b)(3)'s general prohibition of rate discrimination. One still could maintain, we suppose, that taxing railroad property at a higher rate than agricultural land should be considered "another tax that discriminates against a rail carrier," and thus forbidden under subsection (b)(4). That interpretation, however, would subvert the statutory plan by reading subsection (b)(4) to prohibit what subsection (b)(3), in conjunction with subsection (a)(4), was designed to allow. The result would contravene the "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative."

*Mountain States Telephone & Telegraph Co.* v. *Pueblo of Santa Ana,* 472 U. S. 237, 249 (1985) (internal quotation marks omitted).

Congress qualified the definition of "commercial and industrial property" further, limiting the comparison class to property "subject to a property tax levy." 49 U. S. C. § 11503(a)(4). The statute does not define this phrase, which on its face could bear one of two interpretations: (1) taxed property; or (2) taxable property, a broader category consisting of the general mass of property within the State's jurisdiction and power to tax, including property that enjoys a current exemption.

The first interpretation has been the subject of some criticism, see *Western Air Lines, Inc.* v. *Board of Equalization of S. D.,* 480 U. S., at 135 (White, J., concurring),* but we

---

*Western Air Lines, Inc.* v. *Board of Equalization of S. D.* raised the question whether certain property tax exemptions were prohibited under the antidiscrimination provisions of the Airport and Airway Improvement Act of 1982 (AAIA), 49 U. S. C. App. §§ 1513(d)(1)(A)–(C), which are identical for all relevant purposes to analogous provisions under the 4–R Act, 49 U. S. C. §§ 11503(b)(1)–(3). The case was on appeal from the Supreme Court of South Dakota, which had held that such exemptions were not subject to challenge under the AAIA. *Western Air Lines, Inc.* v. *Hughes County,* 372 N. W. 2d 106 (1985). The court rested this ruling upon its conclusion that the definition of "commercial and industrial property" in the AAIA, 49 U. S. C. App. § 1513(d)(2)(D)—which, like the parallel definition in 49 U. S. C. § 11503(a)(4), is limited to property "subject to a property tax levy"—included taxed property but not exempt property, 372 N. W. 2d, at 110. Because the comparison class against which tax discrimination was measured under §§ 1513(d)(1)(A)–(C) did not include exempt property, the court reasoned that the AAIA did not prohibit property tax exemptions. We affirmed, but on grounds unrelated to the court's construction of the terms "commercial and industrial property" and "subject to a property tax levy." *Western Air Lines, Inc.* v. *Board of Equalization of S. D.,* 480 U. S., at 129–134. Justice White concurred, but expressed his view that the "ground on which the South Dakota Supreme Court sustained the tax" was "plainly improvident." *Id.,* at 135; see also *Northwest Airlines, Inc.* v. *North Dakota,* 358 N. W. 2d 515, 517 (N. D. 1984).

believe it follows from the way Congress used identical language elsewhere in § 11503. Section 11503(c) confers jurisdiction upon United States district courts to enforce the terms of § 11503(b) despite the bar otherwise imposed by the Tax Injunction Act, 28 U.S.C. § 1341. Subsection (c)(1) grants district courts the power (under certain circumstances not pertinent here) to prohibit

> "an assessment of the rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the assessed value of all other property *subject to a property tax levy* in the assessment jurisdiction has to the true market value of all other commercial and industrial property." (Emphasis added.)

In the context of this provision, which concerns the differential assessment of taxed property, the words "property subject to a property tax levy" must mean "taxed property." Given the "normal rule of statutory construction" that "'"identical words used in different parts of the same act are intended to have the same meaning,"'" *Sorenson* v. *Secretary of Treasury*, 475 U.S. 851, 860 (1986) (quoting *Helvering* v. *Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1934) (in turn quoting *Atlantic Cleaners & Dyers, Inc.* v. *United States*, 286 U.S. 427, 433 (1932))), that phrase must carry the same meaning in subsection (a)(4), where it qualifies the definition of "commercial and industrial property."

All this bears on the case before us. Because property "subject to a property tax levy" means property that is taxed, the definition of "commercial and industrial property" excludes property that is exempt. Exempt property, then, is not part of the comparison class against which discrimination is measured under subsections (b)(1)–(3), and it follows that railroads may not challenge property tax exemptions under those provisions.

As was the case with agricultural land, we must pay heed to the fact that Congress placed exempt property beyond the reach of subsections (b)(1)–(3). It would be illogical to conclude that Congress, having allowed the States to grant property tax exemptions in subsections (b)(1)–(3), would turn around and nullify its own choice in subsection (b)(4). So the Carlines' reading of subsection (b)(4), while plausible when viewed in isolation (see *supra*, at 339), is untenable in light of § 11503 as a whole. See *Gade* v. *National Solid Wastes Management Assn.*, 505 U. S. 88, 99 (1992); see also *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.*, 484 U. S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law"). It is true that tax exemptions, as an abstract matter, could be a variant of tax discrimination. See *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803 (1989). The structure of § 11503, however, warrants the conclusion that subsection (b)(4) does not limit state discretion to levy a tax upon railroad property while exempting various classes of nonrailroad property.

Other considerations reinforce our construction of the statute. In drafting § 11503, Congress prohibited discriminatory tax rates and assessment ratios in no uncertain terms, see 49 U. S. C. §§ 11503(b)(1)–(3), and set forth precise standards for judicial scrutiny of challenged rate and assessment practices, see §§ 11503(c)(1)–(2). By contrast, the statute does not speak with any degree of particularity to the question of tax exemptions. Subsection (b)(4), which prohibits the States from "impos[ing] another tax that discriminates against a rail carrier," is, at best, vague on the point. Congress did not state whether exemptions are a form of forbidden discrimination against rail carriers, and further did not provide a standard for courts to distinguish valid from invalid exemption schemes.

Had Congress, as a condition of permitting the taxation of railroad property, intended to restrict state power to exempt nonrailroad property, we are confident that it would have spoken with clarity and precision. Property tax exemptions are an important aspect of state and local tax policy. It was common at the time § 11503 was drafted, as it is now, for States with generally applicable ad valorem property taxes to exempt various classes of commercial property. Before 1960, a number of States granted such exemptions. See, e. g., Mo. Rev. Stat. § 150.040 (1949) (exempting unmanufactured articles consigned for sale and held by commission merchants); N. J. Rev. Stat. § 54:4–3.20 (1937) (exempting personal property stored in a public warehouse); Vt. Stat. Ann., Tit. 32, § 3802 (1959) (exempting tools and implements possessed by mechanics and farmers, and highway-building equipment); see also Jacobs, Exemption of Tangible Personalty, in Tax Exemptions 141, 146 (1939) (by 1938, 16 States permitted "temporary exemption of newly located or newly constructed plants, and the machinery and equipment in such plants"). By the 1960's, about 20 States granted real and personal property tax exemptions to pollution control facilities. See McNulty, State Tax Incentives to Fight Pollution, 56 A. B. A. J. 747, 748, and n. 8 (Aug. 1970). By 1971, still well before enactment of the 4–R Act, a majority of the States exempted one or more classes of business personal property, including business inventories, raw materials used in textile manufacturing, manufacturing machinery and allied equipment, and mechanics tools. See Education Commission of the States, Property Assessment and Exemptions: They Need Reform, Table C–1 (Mar. 10, 1973). Given the prevalence of property tax exemptions when Congress enacted the 4–R Act, § 11503's silence on the subject—in light of the explicit prohibition of tax rate and assessment ratio discrimination—reflects a determination to permit the States to leave their exemptions in place.

Principles of federalism support, in fact compel, our view. Subsection (b)(4), like the whole of § 11503, sets limits upon the taxation authority of state government, an authority we have recognized as central to state sovereignty. See, *e. g.*, *Tully* v. *Griffin, Inc.*, 429 U. S. 68, 73 (1976); *Railroad Co.* v. *Peniston*, 18 Wall. 5, 29 (1873). When determining the breadth of a federal statute that impinges upon or pre-empts the States' traditional powers, we are hesitant to extend the statute beyond its evident scope. See *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504, 533 (1992) ("We do not, absent unambiguous evidence, infer a scope of pre-emption beyond that which clearly is mandated by Congress' language") (BLACKMUN, J., concurring); *id.*, at 523 (opinion of STEVENS, J.); *R. J. Reynolds Tobacco Co.* v. *Durham County*, 479 U. S. 130, 140 (1986). We will interpret a statute to pre-empt the traditional state powers only if that result is "the clear and manifest purpose of Congress." *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). As explained above, neither subsection (b)(4) nor the whole of § 11503 meets this standard with regard to the prohibition of property tax exemptions.

The Carlines contend that the legislative history of § 11503 casts doubt upon our interpretation, but the history—to the extent it has any relevance to our inquiry—affords the Carlines no comfort. The excerpts from the legislative record cited by the Carlines do nothing more than manifest Congress' general concern with the discriminatory taxation of rail carriers. See, *e. g.*, S. Rep. No. 94–595, p. 166 (1976) (describing the Senate bill, which the Conference adopted, as prohibiting "the imposition of any other tax which results in the discriminatory treatment of any common or contract carrier"). The Carlines do not point to a single instance in the legislative record suggesting that Congress had any particular concern with property tax exemptions, or that Congress intended to prohibit exemptions in subsection (b)(4). In fact, the available evidence suggests the opposite of what the Carlines would have us believe. See 120 Cong. Rec.

38734 (1974) (providing assurances that subsection (b)(4) would not prevent the States from granting tax exemptions to encourage industrial development) (remarks of Reps. Staggers, Adams, and Kuykendall).

Nor do the Carlines draw our attention to a single instance in the 15-year legislative history of the 4-R Act in which representatives of the railroad industry expressed concern about discriminatory property tax exemptions. In fact, when urging the Senate to adopt subsection (b)(4), industry representatives characterized the provision as prohibiting only discriminatory in lieu taxes and gross receipts taxes; property tax exemptions, in contrast, were not mentioned. See Hearings before the Subcommittee on Surface Transportation of the Senate Committee on Commerce on Legislation Relating to Rail Passenger Service, 94th Cong., 1st Sess., pt. 5, pp. 1837, 1883 (1975). In sum, the Carlines' argument with respect to legislative history is without foundation.

As a final matter, we address the contention that our interpretation of subsection (b)(4) leads to an anomalous result. The Carlines maintain that it would be nonsensical for Congress to prohibit the States from imposing higher tax rates or assessment ratios upon railroad property than upon other taxed property, while at the same time permitting the States to exempt some or all classes of nonrailroad property altogether. That result, it is argued, prohibits discrimination of a mild form, but permits it in the extreme. We think our interpretation is not at all implausible.

To begin with, this is not a case in which the railroads— either alone or as part of some isolated and targeted group— are the only commercial entities subject to an ad valorem property tax. Cf. *Burlington Northern R. Co.* v. *Superior*, 932 F. 2d 1185 (CA7 1991) (occupation tax on owners and operators of "iron ore concentrates docks," in practical effect, applied only to docks owned by one particular rail carrier). If such a case were to arise, it might be incorrect to say that the State "exempted" the nontaxed property. Rather, one

could say that the State had singled out railroad property for discriminatory treatment. See J. Hellerstein & W. Hellerstein, State and Local Taxation 973 (5th ed. 1988) (the term "exemption" does not mean every exclusion from the reach of a levy, but rather exclusions of "property, persons, transactions . . . which are logically within the tax base"). On the record before us, Oregon's ad valorem property tax does not single out railroad property in that manner, and we need not decide whether subsection (b)(4) would prohibit a tax of that nature.

In addition, though some may think it unwise to forbid discrimination in tax rates and assessment ratios while permitting exemptions of certain nonrailroad property, the result is not "so bizarre that Congress 'could not have intended'" it. *Demarest* v. *Manspeaker*, 498 U. S. 184, 191 (1991) (citing *Griffin* v. *Oceanic Contractors, Inc.*, 458 U. S. 564, 575 (1982)). About half of the States grant property tax exemptions to encourage investment in air and water pollution control devices. See 1 CCH State Tax Guide 691–692 (1992). And it is standard practice for States to grant exemptions to commercial entities for other beneficial purposes. See, *e. g.*, La. Const., Art. VII, § 21(F) (10-year exemption for any "new manufacturing establishment or [any] addition to an existing manufacturing establishment"); Ore. Rev. Stat. § 285.597 (1991) (exemption for business property in an "enterprise zone"); Va. Code Ann. § 58.1–3661 (1991) (permitting any county, city, or town to exempt from its property tax "solar energy equipment, facilities or devices" and "recycling equipment, facilities, or devices"). It is within Congress' sound discretion to weigh the benefit of preserving those exemptions, on the one hand, against the benefit of protecting rail carriers from every tax scheme that favors some nonrailroad property, on the other.

We conclude that § 11503, which expresses Congress' resolution of the matter, does not limit the States' discretion to exempt nonrailroad property, but not railroad property, from

ad valorem property taxes of general application. We therefore reverse the judgment of the Court of Appeals and remand the case for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

Section 306(1)(d) of the Railroad Revitalization and Regulatory Reform Act of 1976 (4–R Act), 90 Stat. 54, as amended, 49 U. S. C. § 11503(b)(4) (subsection (b)(4)), prohibits States from imposing taxes that discriminate against railroads.[1] In my view, a state tax that fell upon railroad property, but from which comparable nonrailroad property was exempt, would clearly implicate that prohibition. The Court errs in holding that such arrangements are not even subject to challenge under subsection (b)(4).

Because subsection (b)(4) by its terms bars any tax that "discriminates" against rail carriers, it is not surprising that the Courts of Appeals have held that the provision applies to revenue measures that discriminate by imposing taxes on railroad property and exempting similar property owned by others.[2] While those courts (and the District Court and

---

[1] As originally enacted, subsection (b)(4) prohibited the States from imposing "any other tax which results in discriminatory treatment of a common carrier by railroad . . . ." 4–R Act, § 306(1)(d), 90 Stat. 54. Pursuant to a recodification in 1978, the current version of subsection (b)(4) speaks of "*another tax* that discriminates against" a rail carrier. Congress specifically provided that the 1978 recodification "may not be construed as making a substantive change in the laws replaced." 92 Stat. 1466.

[2] In addition to the Ninth Circuit's decision in this case, 961 F. 2d 813, 818–820 (1992), see *Department of Revenue of Fla.* v. *Trailer Train Co.,* 830 F. 2d 1567, 1573 (CA11 1987) (provision targets "discrimination *in all its guises*" and "requires consideration of tax exemptions in determining whether there has been discriminatory treatment") (citation and internal quotation marks omitted); *Oglivie* v. *State Bd. of Equalization of N. D.,* 657 F. 2d 204, 209–210 (CA8) (history of provision demonstrates that "its purpose was to prevent tax discrimination against railroads in any form whatsoever," including exemption of nonrailroad property), cert. denied,

Court of Appeals in this case) have differed on precisely how to decide whether a wholesale exemption unlawfully "discriminates" and thus gives rise to *liability,* none has taken the position accepted by the Court today that a claim predicated on discriminatory exemptions is not *cognizable* under subsection (b)(4).

As the Court explains, *ante,* at 343, subsection (b)(4) does not contain a specific prohibition against imposing on railroads an ad valorem tax from which other property owners are exempt. That omission, of course, does not answer the question before us: whether the *tax* that Oregon has imposed "discriminates against a rail carrier" within the meaning of subsection (b)(4). A State might discriminate against a disfavored class of taxpayers in a variety of ways. The absence in the 4–R Act of a provision specifically addressing exemptions is no more significant than the absence of a provision addressing deductions, credits, methods of collecting or protesting state taxes, or penalties. Surely a state tax law that allowed a substantial tax deduction for all taxpayers except rail carriers would readily be recognized as discriminatory. That conclusion would not be affected by the fact that the antidiscrimination statute does not speak specifically to deductions. Indeed, the Court suggests that an exemption for all taxpayers except rail carriers would make the tax discriminatory. See *ante,* at 346.

Rather than addressing every means that might be devised to accord discriminatory tax treatment to rail carriers, Congress specified two familiar methods (differential rates and assessments) and then included a general provision de-

---

454 U. S. 1086 (1981). Only the Virginia Supreme Court has reached the contrary conclusion, see *Richmond, F. & P. R. Co.* v. *State Corporation Comm'n,* 230 Va. 260, 262, 336 S. E. 2d 896, 897 (1985), and it did so on a basis that I do not understand the Court to accept today—that because ad valorem property taxes are treated in the first three subsections, an ad valorem property tax may never be attacked as discriminatory under subsection (b)(4).

signed to block other routes to the same end. In my opinion, it is anomalous to read § 11503(b) to prohibit even minor deviations in rates or assessments, but then to allow States to put manifestly disproportionate tax burdens on railroads by exempting most comparable property. Both the text of subsection (b)(4) and its evident purposes convince me that Congress intended to bar discrimination by any means, including exemptions.

In *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803 (1989), this Court held that a State's exemption of a limited class of residents violated a general statutory prohibition against discriminatory taxation (4 U. S. C. § 111) that made no specific reference to exemptions. While I disagreed with the Court's conclusion that the limited exemption at issue could fairly be characterized as discrimination against the protected class, *Davis* surely demonstrates that an exemption, even if not expressly prohibited, may support the conclusion that a tax is discriminatory. Indeed, tax exemptions may make a tax unconstitutionally discriminatory. See, *e. g.*, *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 273 (1984); *Armco Inc.* v. *Hardesty*, 467 U. S. 638, 642–646 (1984). I see no reason why they should be totally ignored when Congress has expressly prohibited "discrimination" against a particular kind of interstate enterprise.

The Court puts great stock in the difference between the specific and strict bar against discriminatory tax rates and assessments in subsections (b)(1)–(3) and the open-ended language of subsection (b)(4), which speaks only tersely of "discriminat[ion]." As the Court explains, the definition of "commercial and industrial property" that is applicable to subsections (b)(1)–(3) is best read to embrace only property that is taxed, rather than exempted. If we were to accept the Carlines' position, the Court reasons, subsection (b)(4) would render the earlier provisions redundant and would "nullify" the limitations Congress placed on the rate and assessment provisions. *Ante*, at 343. I disagree.

The ban on discriminatory rates and assessments targets two patent and historically common forms of discrimination. In order to find discrimination in rates or assessment ratios, a court need only compare the rates and assessments applicable to railroads to the rates and assessments of other owners of comparable property. That inquiry would be complicated indeed if the courts were required to divine the "rates" and "assessments" governing property that is exempt from tax. It is not surprising, then, that the strict bars against disparate rates and assessments exclude from the comparison class property that is not taxed at all.

Congress' exclusion of exempted property from the comparison class for purposes of subsections (b)(1)–(3) does not determine the scope of subsection (b)(4), for that provision does not depend on the limited definition of "commercial and industrial property" that governs its neighbors. Reading subsection (b)(4) to require judicial scrutiny of state exemption schemes creates no disharmony with subsections (b)(1)–(3) unless one assumes that the test of "discrimination" under subsection (b)(4), like the *per se* rules against differential rates and assessments, prohibits all but the most minor differentials in tax treatment between railroad property and owners of similar property. That assumption is unwarranted.

The statute before the Court today (like the statute it construed in *Davis*) does not contain a definition of the term "discrimination," but that familiar concept and the policies of the 4–R Act provide guidance. Like the statute at issue in *Davis*, the 4–R Act protects taxpayers who often have little voice in the policy decisions of the taxing State, and whose situation makes them likely targets for unfavorable treatment.[3] The prohibition of discrimination should be

---

[3] Railroads' high rates of fixed investment and their immobile assets leave them less able than other interstate enterprises to restrain state taxation by threatening to pull up their stakes and leave. See *Burlington Northern R. Co.* v. *Superior*, 932 F. 2d 1185, 1186 (CA7 1991).

read to give effect to those concerns, but it need not be read more broadly. A sensible test for prohibited discrimination—focusing on whether the protected class is being treated substantially less favorably than most similarly situated persons—would leave the States room to employ exemptions without falling afoul of subsection (b)(4).

As *amicus* the Solicitor General suggests, a discrimination standard allows the States to impose disparate tax burdens when the disparity is supported by some legitimate difference between the exempted nonrailroad property and the taxed railroad property.[4] In my view, an exemption for a small minority of the resident taxpayers would not warrant a conclusion that prohibited "discrimination" has occurred. See *Davis*, 489 U. S., at 819–823 (STEVENS, J., dissenting). Because subsection (b)(4) merely protects railroads from discrimination, rather than conferring on them a right to be treated like the most favorably treated taxpayer, a violation would not be established when the tax paid on railroad property is not materially greater than the tax imposed on most comparable property.[5] But surely a tax imposed on rail carriers is not saved from discrimination merely because some other kind of enterprise (*e. g.*, motor carriers) is also subject to taxation.

The evident purpose of this part of the 4–R Act, as the Court recognizes, is to protect a class of interstate enterprises that has traditionally been subject to disproportionately heavy state and local tax burdens. This is an area in which state authority has always been circumscribed, most

---

[4] A State might, for example, be able to defend an exemption by showing that the exempted class was subject to an equivalent tax to which railroads were not.

[5] For similar reasons, the Court of Appeals erred when it held that the remedy for a discriminatory exemption scheme is a refund of the *entire tax* paid by the railroad. See 961 F. 2d, at 823. To remedy unlawful discrimination under subsection (b)(4), a State need refund only the difference between the tax collected from the railroad and the average tax imposed on owners of comparable property.

prominently by the Commerce Clause itself. Subsection (b)(4) plainly requires States to readjust their tax arrangements to the extent those arrangements "discriminat[e]." I cannot agree that federalism "compels" us to read subsection (b)(4) as inapplicable to exemption arrangements. See *ante*, at 345.

Federalism concerns would weigh more heavily in favor of Oregon's position if, as the Court suggests, *ante*, at 344–345, reading subsection (b)(4) to apply to exemption schemes would require States to choose between exempting railroads or eliminating tax exemptions across the board. But as I have explained, such a reading is by no means required. Because the statutory term "discrimination" permits the States greater flexibility to employ exemptions than do the bans on disparate rates and assessments, the Court's concerns about imposing onerous choices on States are overstated.[6] Moreover, an exemption that is meaningfully available to railroads—as in the Court's example of an exemption for funds spent on environmental cleanup—would not make a tax "discriminatory" merely because the exemption may be more useful for some other businesses than it is for railroads. Cf. *Burlington Northern R. Co.* v. *Superior*, 932 F. 2d 1185, 1187 (CA7 1991) (invalidating tax "imposed on an activity in which only a railroad or railroads engage").

The Court appears to hedge against its position that subsection (b)(4) flatly does not apply to taxes and exemption schemes that operate to burden railroads disproportionately. Thus, the Court intimates that the state ad valorem tax

---

[6] The cases in which exemption schemes have been found unlawful under subsection (b)(4) certainly do not suggest any undue incursions into state fiscal policy. See, *e. g.*, *Trailer Train Co.* v. *Leuenberger*, 885 F. 2d 415, 416 (CA8 1988) (violation found because State imposed ad valorem tax on railroad personal property but exempted over 75 percent of comparable property), cert. denied, 490 U. S. 1066 (1989); *Burlington Northern R. Co.* v. *Bair*, 766 F. 2d 1222, 1223–1224 (CA8 1985) (tax on railroad personal property coupled with exemption for 95 percent of other personal property violated statute).

must, in order to escape scrutiny under subsection (b)(4), be "generally applicable," *ante*, at 335, 340, and that a scheme that taxed railroad property but exempted *all* nonrailroad property might be unlawful because it would not be a bona fide "exemption." See *ante*, at 346–347. If I were convinced that Oregon's ad valorem property taxes were generally applicable, I would agree with the Court's disposition of this case. The narrowness or breadth of the exemptions, and correspondingly the evenhanded or discriminatory nature of the tax on railroads, goes to whether a subsection (b)(4) claim has merit, not to whether it is cognizable. The statute provides no basis for prohibiting the exemption of 100 percent of nonrailroad property but allowing the exemption of, for example, 90 percent.

I recognize that application of the statutory "discrimination" standard will sometimes involve problems of line drawing, and that discriminatory exemptions raise special difficulties. But, in my view, the statute requires courts to grapple with those difficulties. I would remand the case to the Court of Appeals to give it an opportunity to resolve the parties' disputes about the extent of any disparate burdens imposed on rail carriers by Oregon's ad valorem tax and to review the discrimination issue in accordance with the considerations set forth in this opinion.

Accordingly, I respectfully dissent.