**OREGON SHORT LINE RAILROAD COMPANY, Union Pacific Railroad Company; Oregon–Washington Railroad & Navigation Co., Plaintiffs–Appellees,**

v.

**DEPARTMENT OF REVENUE OREGON; State of Oregon, Defendants–Appellants.**

**UNION PACIFIC RAILROAD COMPANY; Oregon Short Line Railroad Company; Oregon–Washington Railroad & Navigation Co., Plaintiffs–Appellees,**

v.

**DEPARTMENT OF REVENUE OREGON; State of Oregon, Defendants–Appellants.**

UNION PACIFIC RAILROAD COMPANY; Oregon–Washington Railroad & Navigation Co., Oregon Short Line Railroad Co., Plaintiffs–Appellees,

v.

DEPARTMENT OF REVENUE OREGON; State of Oregon, Defendants–Appellants.

UNION PACIFIC RAILROAD COMPANY and its lessors; Oregon–Washington Railroad & Navigation Company, and Oregon Short Line Railroad Company, Plaintiffs–Appellees,

v.

DEPARTMENT OF REVENUE OREGON; State of Oregon, Defendants–Appellants.

OREGON SHORT LINE RAILROAD COMPANY; Union Pacific Railroad Company; Oregon–Washington Railroad & Navigation Co., Plaintiffs–Appellees,

v.

DEPARTMENT OF REVENUE OREGON, Defendant–Appellant.

OREGON SHORT LINE RAILROAD COMPANY; Union Pacific Railroad Company; Oregon–Washington Railroad & Navigation Co., Plaintiffs–Appellants,

v.

DEPARTMENT OF REVENUE OREGON, Defendant–Appellee.

OREGON SHORT LINE RAILROAD COMPANY; Union Pacific Railroad Company; Oregon–Washington Railroad & Navigation Co., Plaintiffs–Appellants,

v.

DEPARTMENT OF REVENUE OREGON; State of Oregon, Defendants–Appellees.

UNION PACIFIC RAILROAD COMPANY; Oregon Short Line Railroad Company; Oregon–Washington Railroad & Navigation Co., Plaintiffs–Appellants,

v.

DEPARTMENT OF REVENUE OREGON; State of Oregon, Defendants–Appellees.

OREGON SHORT LINE RAILROAD COMPANY; Union Pacific Railroad Company; Oregon–Washington Railroad & Navigation Co., Plaintiffs–Appellants,

v.

DEPARTMENT OF REVENUE OREGON; State of Oregon, Defendants–Appellees.

OREGON SHORT LINE RAILROAD COMPANY; Union Pacific Railroad Company; Oregon–Washington Railroad & Navigation Co., Plaintiffs–Appellants,

v.

DEPARTMENT OF REVENUE OREGON; State of Oregon, Defendants–Appellees.

Nos. 97–35025, 97–35088, 97–35089, 97–35113, 97–35181 to 97–35186.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 4, 1998.

Decided March 23, 1998.

Richard D. Wasserman, Office of the Attorney General, Salem, Oregon, for appellants.

Eugene A. Ritti, Hawley Troxell Ennis & Hawley LLP, Boise, Idaho, for appellees-cross-appellants.

Before: FERNANDEZ, RYMER, and TASHIMA, Circuit Judges.

FERNANDEZ, Circuit Judge:

Union Pacific Railroad Company, Oregon Short Line Railroad Company and Oregon–Washington Railroad and Navigation Company (collectively "the Railroads"),[1] brought a number of actions against the Department of Revenue of the State of Oregon and the State of Oregon (collectively "the State") in which the Railroads sought declaratory and injunctive relief under § 306 of the Railroad Revitalization and Regulatory Reform Act (4–R Act). *See* 49 U.S.C. § 11501. After years of litigation the State moved the district court to dismiss for lack of subject matter jurisdiction. The State argued that in light of the Supreme Court's decision in *Seminole Tribe v. Florida*, 517 U.S. 44, 71–72, 116 S.Ct. 1114, 1131, 134 L.Ed.2d 252 (1996), it was immune under the Eleventh Amendment to the United States Constitution. The district court denied the motion and entered judgment against the State. The Railroads disputed the district court's ruling that they must pay Oregon's statutory interest rate, rather than the lower federal interest rate, on disputed taxes which had not previously been paid into escrow accounts. Both the State and the Railroads appealed. We affirm.

## BACKGROUND

The Railroads filed a number of actions against the State in which they alleged that the State had discriminated against them by overvaluing their rail transportation property and further discriminated in assessing the taxes on that property by using 100% of the property's true market value, rather than the 88% of true market value which was applied to other commercial and industrial property in Oregon.

The actions were brought pursuant to § 306 of the 4–R Act. *See* 49 U.S.C. § 11501.[2] These claims were tried before a magistrate judge in September of 1991, and the district court adopted the magistrate judge's findings of fact and conclusions of law and entered a judgment on the claims on September 2, 1992. Another claim regarding the personal property tax had been bifurcated and awaited final resolution at some later time. That claim, therefore, remained open, and the court did not direct the entry of judgment pursuant to Federal Rule of Civil Procedure 54. Meanwhile, litigation related to the Railroads' personal property claim was wending its way through the courts, and was finally disposed of when we issued our decision regarding the interest rate that had to be paid by the Railroads on tax monies which had been kept in escrow accounts rather than actually turned over to the State. *See MHC, Inc. v. Oregon Dep't of Revenue*, 66 F.3d 1082 (9th Cir.1995). In *MHC*, we held that the State could not collect 16% interest on the funds that had been deposited in the escrow account, and that it was limited to the lower federal interest rate on money judg-

1. Oregon Short Line Railroad Company and Oregon–Washington Railroad and Navigation Company are wholly owned subsidiaries of Union Pacific Railroad Company. They own lines of railroad, which Union Pacific actually operates.

2. The language of the original § 306, first codified at 49 U.S.C. § 26c (1976 ed.) was slightly revised when the provision was recodified in 1978 (49 U.S.C. § 11503) and then again in 1995 (49 U.S.C. § 11501). The revisions were not intended to make a substantive change in the

law. *See Burlington N. R.R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 457 n. 1, 107 S.Ct. 1855, 1858 n. 1, 95 L.Ed.2d 404 (1987) (1978 revision "'may not be construed as making a substantive change in the laws replaced'"); H.R. Conf. Rep. No. 104–422, at 878 (1995) ("This provision (11301) replaces without substantive change former section 11503."). For convenience, further citations to the statute refer to the text of its current version in 49 U.S.C. § 11501, and all references to § 11501 are to 49 U.S.C. § 11501.

ments provided by 28 U.S.C. § 1961. *See id,* at 1090–91.

On April 8, 1996, after the *MHC* ruling came down, the district court held a conference with the parties regarding this litigation. Because the Railroads had paid the 16% statutory interest rate when the escrow accounts were disbursed, the State owed them a refund. The Railroads informed the court that they were dismissing all of the claims still at issue. Both parties also reported an agreement on the procedure to be used in performing interest calculations in compliance with *MHC.* The district court set a "final paper call" for June 14, 1996.

However, events were then outstripping this litigation because on March 27, 1996, the Supreme Court had decided *Seminole Tribe.* Based upon that decision, the State filed its motion to dismiss this action on April 22, 1996, because, it argued, it had Eleventh Amendment immunity from suit under the 4–R Act and the court had "no jurisdiction to hear further proceedings.".[3] The district court denied the motion because, it declared, the State had waived its immunity and *Seminole Tribe* should not apply retroactively to this case.

The reserved personal property issues, however, still remained unresolved. They were finally decided when the district court ruled that the Railroads were entitled to interest from the State on amounts that they had overpaid, but that the Railroads were not entitled to relief from Oregon's 16% interest rate on taxes that they had not paid or escrowed at all. A final judgment was entered on December 3, 1996, and this appeal followed.

## JURISDICTION AND STANDARD OF REVIEW

Unless the Eleventh Amendment precludes it, the district court had jurisdiction pursuant to 28 U.S.C. § 1331 and 49 U.S.C. § 11501(c). We have jurisdiction pursuant to 28 U.S.C. § 1291.

██ "Whether a state is immune from suit under the Eleventh Amendment is a question of law and is reviewed *de novo.*"

*Micomonaco v. Washington,* 45 F.3d 316, 319 (9th Cir.1995). Similarly, we will review the legal issues regarding the appropriate interest rate to apply to unpaid taxes de novo. *Cf. MHC,* 66 F.3d at 1090–91 (clearly deciding a similar interest rate issue as a matter of law without expressly saying so).

## DISCUSSION

In § 11501(b), Congress declared that certain actions "unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a State may not do any of them...." It then went on to provide that "[n]otwithstanding section 1341 of title 28 [the Anti-injunction Act] and without regard to the amount in controversy or citizenship of the parties, a district court of the United States has jurisdiction, concurrent with other jurisdiction of courts of the United States and the States, to prevent a violation of subsection (b) of this section." 49 U.S.C. § 11501(c). There is no dispute that Congress truly intended to confer jurisdiction upon the district courts in actions against states for the purpose of precluding the discrimination which Congress had found. *Cf. ACF Indus., Inc. v. Department of Revenue,* 961 F.2d 813, 816 (9th Cir.1992), *rev'd on other grounds,* 510 U.S. 332, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994). The major issue before us is whether, in light of *Seminole Tribe,* Congress could constitutionally do so. If it could, we can go on to decide the subsidiary interest rate issue raised by the Railroads.

### A. *The Constitutionality of § 11501(c)*

██ The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Of course, that means that neither citizens' of other states nor a state's own citizens can sue it in federal court. *See Idaho v. Coeur*

---

**3.** At oral argument the State confirmed that it was asserting its immunity only in order to preclude proceedings after March 27, 1996, and was

not seeking to attack earlier decisions, orders or settlements.

*d'Alene Tribe*, —— U.S. ——, ——, 117 S.Ct. 2028, 2033, 138 L.Ed.2d 438 (1997). Thus we give states the "dignity and respect" to which they are entitled. *Id.* But there are exceptions to that immunity. As we have said, "Congress can abrogate the Eleventh Amendment without the consent of the states in certain instances or a state may waive its immunity by consenting to suit in federal court." *Micomonaco*, 45 F.3d at 319. We all now know that Congress cannot rely upon the Commerce Clause as a source of abrogation of the Eleventh Amendment because "[t]he Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." *Seminole Tribe*, 517 U.S. at 71–74, 116 S.Ct. at 1131–32. We have known that since March 27, 1996, when *Seminole Tribe* was decided.

The Railroads first challenge the State's claim that the district court had no jurisdiction by pointing to the waiver exception, and then go on to argue that *Seminole Tribe* should not be applied to this case at all. We must first decide whether these non-constitutional grounds uphold the district court's decision and will only turn to the constitutional challenge, if these grounds fail. *See Jean v. Nelson*, 472 U.S. 846, 854, 105 S.Ct. 2992, 2997, 86 L.Ed.2d 664 (1985); *Meinhold v. United States Dep't of Defense*, 34 F.3d 1469, 1474 (9th Cir.1994). As we will demonstrate, the non-constitutional grounds cannot do tasks that the Railroads have assigned to them.

### (1) *Waiver*

■ The Railroads assert that the State waived its Eleventh Amendment immunity for all purposes because it actively participated in this litigation up to the time that *Seminole Tribe* was decided. While we will say a bit more about our reasoning, we essentially disposed of this claim when we held that:

> The State's failure to raise an immunity defense before the district court, at a time where it was clearly foreclosed by *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989) [the case overruled by *Seminole Tribe* ], is far from an express or implied waiver. Given the lack of any other evidence establishing

waiver, review by a federal court is foreclosed.

*Quillin v. Oregon*, 127 F.3d 1136, 1139 (9th Cir.1997); *see also Mueller v. Thompson*, 133 F.3d 1063, 1064–66 (7th Cir.1998). Here, as in *Quillin*, the State acceded to the district court's jurisdiction and vigorously participated in this action until *Seminole Tribe* was decided. Here, as in *Quillin*, it cannot be said that the State's mere participation was the result of an express or implied waiver. Were we to hold otherwise, we would not be giving proper respect to the requirement that states cannot easily waive their immunity. *See Gamboa v. Rubin*, 80 F.3d 1338, 1350 (9th Cir.), *vacated on other grounds*, 101 F.3d 90 (9th Cir.1996) (en banc).

But, argue the Railroads, the State entered into stipulations which formed the bases for consent orders, and that must amount to a waiver. We think not. The Railroads' authority for that proposition rests heavily on two cases. *See Mitchell v. Commission on Adult Entertainment Establishments*, 12 F.3d 406, 408–09 (3d Cir.1993); *Garrity v. Sununu*, 752 F.2d 727, 737–38 (1st Cir.1984). In *Mitchell*, there was no impediment to asserting immunity, but the state did not appeal the denial of immunity directly. It only sought to raise immunity in a collateral attack on the judgment. *See* 12 F.3d at 409. Similarly, in *Garrity*, the state never did object directly to the underlying jurisdiction of the district court, but actually acquiesced and then mounted a collateral attack on a fee award. *See* 752 F.2d at 737–38. Even if we were to otherwise embrace the holding of those cases, they would be inapposite. Here the State could not raise the issue until *Seminole Tribe* was decided, and promptly attacked jurisdiction once that decision was handed down.

■ In a final attempt to use waiver to parry the State's allonge, the Railroads point to the fact that Oregon enacted statutes for the purpose of implementing what then appeared to be a possible conclusion of the litigation process. Oregon provided for the method of repayment of refunds ordered by the courts, including any federal court. *See* Or.Rev.Stat. § 311.813. It also provided for the method of allocation of tax payments

where an assessment was being appealed to the federal courts. *See* 1995 Or. Laws, chapter 293, § 9. But those statutes merely facilitated dealing with a process which threatened to go forward whether the State liked it or not. They are far from stating a waiver in "the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 240, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 171 (1985); *see also Clallam County v. Department of Transp.*, 849 F.2d 424, 426–27 (9th Cir.1988). In fact, the statutes are, again, nothing more than a recognition that the litigation could and would proceed whether the State liked it or no.

Thus, we return to the place where we started, *Quillin*, 127 F.3d at 1139, and find the State's various actions to be "far from an express or implied waiver." Because prior to *Seminole Tribe* the State was forced to participate in these proceedings, we would expect it to have done so in good faith and with vigor. It was not forced into the Hobson's choice of either refusing to fully participate in the litigation or waiving its immunity for all future proceedings when it participated in this litigation.[4]

### (2) *Retroactivity*

■ The Railroads essentially argue that *Seminole Tribe* does not apply to this case because when that case was decided most of the issues in this case had already been determined. We are satisfied that the "most of the issues" argument is not supportable. The rule is that when the Supreme Court applies a federal law ruling to the parties before it, that rule has full retroactive effect to all cases which are not yet final. *See Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 97, 113 S.Ct. 2510, 2517, 125 L.Ed.2d 74 (1993); *United States v. Real Property Located At 20832 Big Rock Drive*, 51 F.3d 1402, 1406 (9th Cir.1995). Even if proceedings at the district court have been completed, the rule applies if the case is still pending on direct review. *Id.* That does not mean that retroactivity ceases to apply when the case is almost final or close to being final. It means that it ceases to apply when the case *is* final.

Here it is pellucid that the case was not final when *Seminole Tribe* was decided. The litigation had not ended. Indeed, the district court's ultimate determination on December 3, 1996, was properly labeled as the final judgment. *See National Distrib. Agency v. Nationwide Mut. Ins. Co.*, 117 F.3d 432, 433 (9th Cir.1997); *United States v. One 1986 Ford Pickup*, 56 F.3d 1181, 1184–85 (9th Cir.1995).

### (3) *The Fourteenth Amendment*

■ Because neither waiver nor retroactivity principles will support the district court's determination that it did have jurisdiction, we must turn to the constitutionality issue. The district court did not reach that issue, but we may affirm "on any basis the record supports, including one the district court did not reach." *Herring v. FDIC*, 82 F.3d 282, 284 (9th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 581, 136 L.Ed.2d 512 (1996).

Again, *Seminole Tribe* made it clear that § 11501(c) cannot be upheld pursuant to Congress' authority under the Commerce Clause—U.S. Const. art. I, § 8, cl. 2. *See* 517 U.S. at 71–74, 116 S.Ct. at 1131–32. That does not end the discussion because "through the Fourteenth Amendment, federal power [was] extended to intrude upon the province of the Eleventh Amendment and therefore ... § 5 of the Fourteenth Amendment allowed Congress to abrogate the immunity from suit guaranteed by that Amendment." *Id.* at 59, 116 S.Ct. at 1125. As the Supreme Court has pointed out, if Congress "has unequivocally expresse[d] its intent to abrogate the immunity" and if "Congress has acted pursuant to a valid exercise of power," the State's immunity has been effectively abrogated. *Id.* at 55, 116 S.Ct. at 1123 (internal quotations omitted).

■ In this case, no one doubts that Congress did intend to abrogate the State's immunity when it enacted § 11501(c). But could it do so? We must answer that question without reference to what Congress did or did not say about the source of its power. We are not called upon to decide whether

4. As we noted previously, the State's attack is    limited to post-*Seminole Tribe* proceedings.

Congress pointed to the right part of the Constitution when it passed this legislation. *See Mills v. Maine,* 118 F.3d 37, 43 (1st Cir.1997). Rather,

> It is in the nature of our review of congressional legislation defended on the basis of Congress's powers under § 5 of the Fourteenth Amendment that we be able to discern some legislative purpose or factual predicate that supports the exercise of that power. That does not mean, however, that Congress need anywhere recite the words "section 5" or "Fourteenth Amendment" or "equal protection" for [t]he ... constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise.

*EEOC v. Wyoming,* 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 1064 n. 18, 75 L.Ed.2d 18 (1983) (citations and internal quotations omitted). For that reason, it matters not that we have previously upheld the statute under the Commerce Clause. *See Arizona v. Atchison, Topeka & Santa Fe R.R. Co.,* 656 F.2d 398, 406–10 (9th Cir.1981). Even though the Commerce Clause can no longer be relied upon, if the Fourteenth Amendment will support the section, that will be quite sufficient. *See Western & Southern Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 655–56, 101 S.Ct. 2070, 2076, 68 L.Ed.2d 514 (1981) (an allegedly discriminatory state tax can be challenged under the Commerce Clause, the Privileges and Immunities Clause of art. IV, § 2, and the Equal Protection Clause). Thus, we need only ask whether the statute is appropriate legislation to enforce the Equal Protection Clause.

We have held that:

> a statute is appropriate legislation to enforce the Equal Protection Clause if the statute may be regarded as an enactment to enforce the Equal Protection Clause, [if] it is plainly adapted to that end and [if] it is not prohibited by but is consistent with the letter and spirit of the constitution.

*Clark v. California,* 123 F.3d 1267, 1270 (9th Cir.1997), *petition for cert. filed,* 66 U.S.L.W. 3308 (U.S. Oct. 20, 1997) (No. 97–686) (internal quotations omitted); *see also Katzenbach v. Morgan,* 384 U.S. 641, 650, 86 S.Ct. 1717, 1723, 16 L.Ed.2d 828 (1966). In that regard, we have stated that "Congress's power to pass legislation under the Fourteenth Amendment is very broad." *Clark,* 123 F.3d at 1270. That is because "[c]orrectly viewed, § 5 is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." *Katzenbach,* 384 U.S. at 651, 86 S.Ct. at 1723–24. Interestingly enough, that means that Congress can even "create broader equal protection rights than the Constitution itself mandates." *Clark,* 123 F.3d at 1270. That does not mean that Congress can go so far as to redefine the very substance of the Constitution itself under the guise of enforcing equal protection concepts. *See City of Boerne v. Flores,* ——— U.S. ———, ———, 117 S.Ct. 2157, 2164, 138 L.Ed.2d 624 (1997). It does mean, however, that Congress can enact legislation which "prohibits conduct which is not itself unconstitutional and intrudes into legislative spheres of autonomy previously reserved to the States." *Id.* at ———, 117 S.Ct. at 2163 (internal quotations omitted); *see also City of Rome v. United States,* 446 U.S. 156, 176, 100 S.Ct. 1548, 1561, 64 L.Ed.2d 119 (1980).

While the area of taxation might not immediately leap to mind when one thinks of equal protection problems, there can be little doubt that discriminatory state taxation can implicate equal protection concerns. States do have broad authority to classify those whom they intend to tax and to impose different tax burdens on different classes. *See Allegheny Pittsburgh Coal Co. v. County Comm'n,* 488 U.S. 336, 344, 109 S.Ct. 633, 638, 102 L.Ed.2d 688 (1989); *Nashville, C. & St. L. Ry. v. Browning,* 310 U.S. 362, 368, 60 S.Ct. 968, 972, 84 L.Ed. 1254 (1940); *Southern Ry. Co. v. Greene,* 216 U.S. 400, 417, 30 S.Ct. 287, 291, 54 L.Ed. 536 (1910). Nevertheless, the Supreme Court has not hesitated to strike down taxation schemes which do not rest "upon some reasonable consideration of difference or policy...." *Allegheny Pittsburgh,* 488 U.S. at 344, 109 S.Ct. at 638; *see also Southern Ry.,* 216 U.S. at 417–18, 30 S.Ct. at 291; *cf. Atchison, Topeka, & Santa Fe Ry. Co. v. Vosburg,* 238 U.S. 56, 61–62, 35 S.Ct. 675, 676–77, 59 L.Ed. 1199 (1915); *Gulf, C. & S.F. Ry. Co. v. Ellis,* 165 U.S. 150, 165–66, 17 S.Ct. 255, 261, 41 L.Ed. 666 (1897).

It is just that type of unreasonable classification and discrimination that § 11501 was designed to correct. The statute itself refers to the unreasonable burdens and discrimination which it intends to eliminate. *See* § 11501(b). Moreover, as the Supreme Court said in *Department of Revenue v. ACF Indus., Inc.,* 510 U.S. 332, 336, 114 S.Ct. 843, 846, 127 L.Ed.2d 165 (1994):

> When drafting the legislation, Congress was aware that the railroads are easy prey for State and local tax assessors in that they are non-voting, often non-resident, targets for local taxation, who cannot easily remove themselves from the locality. Section 306 of the 4–R Act, ... addresses this concern by prohibiting the States (and their subdivisions) from enacting certain taxation schemes that discriminate against railroads.

(internal quotations and citations omitted); *see also Burlington Northern,* 481 U.S. at 457, 107 S.Ct. at 1858 ("After an extended period of congressional investigation, Congress concluded that 'railroads are over-taxed by at least $50 million each year.'" (citation omitted)). In the face of all of that, it would take an unusual amount of pertinacity to cling to the notion that Congress could not enact § 11501 pursuant to its power under the Fourteenth Amendment.[5] Surely, the statute may be regarded as an enactment to enforce the equal protection clause, is consistent with the Constitution, is adapted to its ends, and does not provide remedies which are disproportionate to the desired goal of eliminating discrimination. *See City of Boerne,* —— U.S. at ——, 117 S.Ct. at 2164. The proportionality of the remedy is underscored by Congress' decision to leave some play in the joints by withholding relief when the disparity of treatment is less than 5%. *See* § 11501(c).

In fact, the specific actions precluded by § 11501(b) include the assessment of rail transportation property at a higher ratio to true market value than that used for other commercial and industrial property, and imposing a tax that discriminates against rail carriers. At the fringes, some classifications prohibited by § 11501 might have been sustainable against an equal protection challenge in the Supreme Court. *See Browning,* 310 U.S. at 368–70, 60 S.Ct. at 972 (holding that when a state's method of taxation of railroads and other utilities was historical and not invidious there was no equal protection violation). But, given the problems it saw, Congress could eliminate all railroad specific discrimination, even if it eliminated more practices than the Supreme Court itself would have done. *See Clark,* 123 F.3d at 1270. Therefore, § 11501 is a constitutionally sound enactment, which abrogated the State's Eleventh Amendment immunity, because Congress could draw its authority from § 5 of the Fourteenth Amendment.

### B. *Interest Rate*

■ The Railroads complain that, pursuant to Oregon Revised Statutes Section 311.500, they are being charged interest at the rate of about 16% per annum (1 1/3 percent per month) on the amount of overdue taxes that they had neither paid over to the State nor deposited in a district court ordered escrow account. They support their argument against that interest rate by relying on our decision in *MHC,* 66 F.3d at 1090, in which we declared that where the deposited taxes had been paid into a court registry or escrow account as a condition of interim equitable relief under § 11501 of the 4–R Act, it would be improper to allow the State to then collect at the 16% interest rate. We explained:

> Were the state to prevail, the railroads would have been both deprived of the use of their funds for a significant period of time and subjected to a substantial economic penalty for placing their funds in escrow pursuant to a court order. Under such a regime, railroads would be strongly discouraged from availing themselves of the remedy afforded by the 4–R Act.

*Id.* In the case at hand, however, there was no such problem because the Railroads did not pay the disputed amounts into the court registry or into an escrow account. They kept those amounts and used them for their own purposes. They were not at all restrained from exercising their rights under

---

5. The State, by the way, has not appealed the determination that it did discriminate against the

Railroads in just the ways proscribed by Congress.

the 4–R Act. Rather, they did exercise them and enjoyed the full use of their funds at the same time.

Were that all, this distinction would be an end to the Railroads' claim. It is not all because in a dictum in *MHC* we also reflected upon the fact that one of the purposes of § 11501(c) is to allow railroads to put off payment of their taxes, while one of the purposes of the 16% interest rate is to encourage railroads to pay up right away. Thus, § 11501(c) and the interest rates can pull in different directions. We said, "[t]his conflict alone would seem to be sufficient to bar assessment of punitive interest [16% per annum]. However, we need not go that far in this case." *Id.* at 1089 (citation omitted). The Railroads faced no such conundrum in this case. They were not required to pay over the tax because Oregon did not insist that they do so. *See* Or.Rev.Stat. § 308.020. Thus, no rights of the Railroads were restrained. They could have paid the disputed amounts into a special county account, had they wanted to do so. *See* Or.Rev.Stat. § 311.160(3). And if they felt that the choices the State gave them were connected to or helped to foster a form of discrimination, § 11501 itself was available. The Railroads' decision to simply hold on to their money rather than choose another expedient was just that—their choice. We see no reason to allow the Railroads to retain the full use of their money while avoiding the 16% interest rate. We, therefore, affirm the district court's denial of relief from that rate.

### CONCLUSION

After more than a decade of litigation over its taxation of the Railroads, the State believed that the Supreme Court had given it a handsel when *Seminole Tribe* was decided. If § 11501 of the 4–R Act depended on the Commerce Clause for its validity, the State would have been right. As it is, *Seminole Tribe* cannot deliver the State from its woe because the constitutional validity of § 11501 rests on the Equal Protection Clause of the Fourteenth Amendment. Thus, Congress properly abrogated the State's Eleventh Amendment immunity, and the district court had jurisdiction over these cases.

AFFIRMED.