*280 Justice Kagan
delivered the opinion of the Court.
The Railroad Revitalization and Regulatory Reform Act of 1976 restricts the ability of state and local governments to levy discriminatory taxes on rail carriers. We consider here whether a railroad may invoke this statute to challenge sales and use taxes that apply to rail carriers (among others), but exempt their competitors in the transportation industry. We conclude that the railroad may do so.
I
A
Congress enacted the Railroad Revitalization and Regulatory Reform Act of 1976 (Act or 4-R Act) to “restore the financial stability of the railway system of the United States,” among other purposes. § 101(a), 90 Stat. 33. To help achieve this goal, Congress targeted state and local taxation schemes that discriminate against rail carriers. Burlington Northern R. Co. v. Oklahoma Tax Comm’n, 481 U. S. 454, 457 (1987). The provision of the Act at issue here, now codified at 49 U. S. C. § 11501,[1] bars States and localities from engaging in four forms of discriminatory taxation. 90 Stat. 54.
Section 11501(b) describes the prohibited practices. It begins with three provisions addressed specifically to prop *281 erty taxes; it concludes with a catch-all provision concerning other taxes. According to § 11501(b), States (or their subdivisions) “may not”:
“(1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.
“(2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.
“(3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.
“(4) Impose another tax that discriminates against a rail carrier.”
The following subsection confers jurisdiction on federal courts to “prevent a violation” of § 11501(b) notwithstanding the Tax Injunction Act, 28 U. S. C. § 1341, which ordinarily prohibits federal courts from enjoining the collection of state taxes when a remedy is available in state court. § 11501(c).[2]
B
Petitioner CSX Transportation, Inc. (CSX) is an interstate rail carrier that operates in Alabama and pays taxes there. *282 Alabama imposes a sales tax of 4% on the gross receipts of retail businesses, Ala. Code § 40-23-2(1) (2010 Cum. Supp.), and a use tax of 4% on the storage, use, or consumption of tangible personal property, §40-23-61(a) (2003). Railroads pay these taxes when they purchase or consume diesel fuel. But railroads’ main competitors — interstate motor and water carriers — are generally exempt from paying sales and use taxes on their fuel (although fuel for motor carriers is subject to a separate excise tax).[3]
Alleging that Alabama’s tax scheme discriminates against railroads in violation of § 11501(b)(4) of the 4-R Act, CSX sued respondents, the Alabama Department of Revenue and its Commissioner (Alabama or State), in Federal District Court. In particular, CSX complained that the State could not impose sales and use taxes on railroads’ purchase and consumption of diesel fuel while exempting motor and water carriers from those taxes. App. 22 (Complaint ¶ 26).
The District Court dismissed CSX’s suit as not cognizable under the 4-R Act, and the United States Court of Appeals for the Eleventh Circuit affirmed in a brief per curiam decision. 350 Fed. Appx. 318 (2009). The Eleventh Circuit rested on its earlier decision in Norfolk Southern R. Co. v. Alabama Dept. of Revenue, 550 F. 3d 1306 (2008), which involved a nearly identical challenge to the application of Alabama’s sales and use taxes.
In Norfolk Southern, the Eleventh Circuit rejected the plaintiff railroad’s challenge, principally in reliance on this Court’s decision in Department of Revenue of Ore. v. ACF *283 Industries, Inc., 510 U. S. 332 (1994). In that case, we held that a railroad could not invoke § 11501(b)(4) to challenge a generally applicable property tax on the basis that certain non-railroad property was exempt from the tax. Id., at 335. The Eleventh Circuit recognized that the case before it involved sales and use taxes — not property taxes, which the statutory scheme separately addresses. Norfolk Southern, 550 F. 3d, at 1314. The court concluded, however, that this difference was immaterial, and accordingly held that a railroad could not object to Alabama’s sales and use taxes simply because the State provides exemptions from them. Id., at 1316.
CSX petitioned for a writ of certiorari, arguing that the Eleventh Circuit had misunderstood ACF Industries and noting a split of authority concerning whether railroads may bring a challenge under § 11501(b)(4) to non-property taxes from which their competitors are exempt.[4] We granted certiorari, 560 U. S. 964 (2010), and now reverse.
II
We begin, as in any case of statutory interpretation, with the language of the statute. Hardt v. Reliance Standard Life Ins. Co., 560 U. S. 242, 251 (2010). Section 11501(b)(4) provides that a State may not “[ijmpose another tax that discriminates against a rail carrier.” CSX wishes to bring an action under this provision because rail carriers, but not motor or water carriers, must pay Alabama’s sales and use taxes on diesel fuel. To determine whether this suit may go *284 forward, we must therefore answer two questions. Is CSX challenging “another tax” within the meaning of the statute? And, if so, might that tax “discriminate” against rail carriers by exempting their competitors?[5]
An excise tax, like Alabama’s sales and use tax, is “another tax” under subsection (b)(4).[6] The 4-R Act does not define “tax”; nor does the statute otherwise place any matters within, or exclude any matters from, the term’s ambit. In these circumstances, we look to the word’s ordinary definition, Asgrow Seed Co. v. Winterboer, 513 U. S. 179, 187 (1995), and we note what taxpayers have long since discovered— that the meaning of “tax” is expansive. A State (or other *285 governmental entity) seeking to raise revenue may choose among multiple forms of taxation on property, income, transactions, or activities. “[A]nother tax,” as used in subsection (b)(4), is best understood to refer to all of these — -more precisely, to encompass any form of tax a State might impose, on any asset or transaction, except the taxes on property previously addressed in subsections (b)(1)-(3). See Burlington Northern R. Co. v. Superior, 932 F. 2d 1185, 1186 (CA7 1991) (Subsection (b)(4) includes “an income tax, a gross-receipts tax, a use tax, an occupation tax . . . —whatever”). The phrase “another tax” is a catch-all.
In particular, we see no reason to interpret subsection (b)(4) as applying only to the gross-receipts taxes — known as “in lieu” taxes — that some States imposed instead of property taxes at the time of the Act’s passage. See Brief for Respondents 53-55; Brief for State of Washington et al. as Amici Curiae 20-22. The argument in favor of this construction relies on the House Report concerning the bill, which described subsection (b)(4) as prohibiting “the imposition of... the so-called ‘in lieu tax.’ ” H. R. Rep. No. 94-725, p. 77 (1975). But the Conference Report on the final bill abandoned the House Report’s narrowing language and described the subsection as it was written — as prohibiting, without limitation, “the imposition of any other tax which results in the discriminatory treatment of any” railroad. S. Conf. Rep. No. 94-595, pp. 165-166 (1976); accord, S. Rep. No. 94-499, p. 65 (1975). And the statutory language is the real crux of the matter: Subsection (b)(4) speaks both clearly and broadly, and a legislative report misdescribing the provision cannot succeed in altering it.[7]
*286 Nor do we agree with the Eleventh Circuit’s apparent view that CSX does not challenge “another tax” because its complaint relies on the exemptions the State has given. See Norfolk Southern, 550 F. 3d, at 1315 (“The language of section (b)(4) prohibits a discriminatory ‘tax’ not a discriminatory tax exemption”); Brief for American Trucking Associations, Inc., as Amicus Curiae 9. What the complaint protests is Alabama’s imposition of taxes on the fuel CSX uses; what the complaint requests is that Alabama cease to collect those taxes from CSX. App. 23. The exemptions, no doubt, play a central role in CSX’s argument: They demonstrate, in CSX’s view, that the State’s sales and use taxes discriminate against railroads. See id., at 22, ¶¶ 24-26. But the essential subject of the complaint remains the taxes Alabama levies on CSX.
The key question thus becomes whether a tax might be said to “discriminate” against a railroad under subsection (b)(4) because the State has granted exemptions from the tax to other entities (here, the railroad’s competitors). The statute does not define “discriminates,” and so we again look to the ordinary meaning of the word. See supra, at 284. “Discrimination” is the “failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored.” Black’s Law Dictionary 534 (9th ed. 2009); accord, id., at 420 (5th ed. 1979); see also Webster’s Third New International Dictionary 648 (1976) (“discriminates” means “to make a difference in treatment or *287 favor on a class or categorical basis in disregard of individual merit”). To charge one group of taxpayers a 2% rate and another group a 4% rate, if the groups are the same in all relevant respects, is to discriminate against the latter. That discrimination continues (indeed, it increases) if the State takes the favored group’s rate down to 0%. And that is all an exemption is. See West Lynn Creamery, Inc. v. Healy, 512 U. S. 186, 210-211 (1994) (Scalia, J., concurring in judgment) (noting that an “ ‘exemption’ from ... a ‘neutral’ tax” for favored persons “is no different in principle” than “a discriminatory tax .. . imposing a higher liability” on disfavored persons). To say that such a tax (with such an exemption) does not “discriminate” — assuming the groups are similarly situated and there is no justification for the difference in treatment — is to adopt a definition of the term at odds with its natural meaning.
In line with this understanding, our decisions have repeatedly recognized that tax schemes with exemptions may be discriminatory. In Davis v. Michigan Dept. of Treasury, 489 U. S. 803 (1989), for example, we reviewed a state income tax provision that exempted retirement benefits given by the State, but not those paid by the Federal Government. We held that the tax “discriminate[d]” against federal employees under 4 U. S. C. § 111, which serves to protect those employees from discriminatory state taxation. Similarly, our dormant Commerce Clause cases have often held that tax exemptions given to local businesses discriminate against interstate actors. See, e. g., Bacchus Imports, Ltd. v. Dias, 468 U. S. 263, 268-269 (1984) (holding that a state excise tax on alcohol “diseriminate[d]” against interstate businesses because of exemptions granted to local producers); Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U. S. 564, 588-589 (1997) (invalidating as “discriminatory” a state property tax that exempted organizations operating for the benefit of residents, but not organizations aimed at nonresidents). And even our decision in ACF Industries, on which *288 the Eleventh Circuit relied in dismissing CSX’s suit, made clear that tax exemptions “could be a variant of tax discrimination.” 510 U. S., at 343.
Nor does the 4-R Act limit the prohibited discrimination to state tax schemes that unjustifiably exempt local actors, as opposed to interstate entities. Alabama argues for this result, claiming that § 11501(b) is designed “to protect interstate carriers against discrimination vis-á-vis local businesses.” Brief for Respondents 29. But the text of § 11501(b) tells a different story. Consistent with the Act’s purpose of restoring the financial stability of railroads (not of interstate carriers generally), supra, at 280, each of subsection (b)’s provisions proscribes taxes that specially burden a rail carrier’s property or otherwise discriminate against a rail carrier. And not a single provision of the Act (including the references in subsections (b)(1) — (3) to “commercial and industrial property”) distinguishes between local and non-local taxpayers who receive favorable tax treatment. The distinctions drawn in § 11501(b) are not between interstate and local actors, as the State contends, but rather between railroads and other actors, whether interstate or local. Accordingly, a state excise tax that applies to railroads but exempts their interstate competitors is subject to challenge under subsection (b)(4) as a “tax that discriminates against a rail carrier.”[8]
*289 III
As against the plain language of subsection (b)(4), Alabama offers two arguments based on our decision in ACF Industries. The first claim, which the Eleventh Circuit accepted, rests on the reasoning we adopted in ACF Industries: We concluded there that railroads could not challenge property tax exemptions under subsection (b)(4), and Alabama asserts that the same analysis applies to excise (and other non-property) tax exemptions. The second contention focuses on alleged problems that would emerge in the application of § 11501(b) if the rule of ACF Industries did not govern all tax exemptions. On this view, even if ACF Industries’ reasoning is irrelevant to cases involving excise taxes, its holding must extend to those cases to prevent inconsistent or *290 anomalous results. We reject each of these arguments. We stand foursquare behind our decision in ACF Industries, but we will not extend it in the way the State wishes.
A
In ACF Industries, we considered whether a railroad could sue a State under subsection (b)(4) for taxing railroad property while exempting certain other commercial property. We held that the railroad could not do so. We noted that the language of subsection (b)(4), when viewed in isolation, could be read to allow such a challenge. But we reasoned that the structure of § 11501 required the opposite result. 510 U. S., at 343. The Eleventh Circuit considered ACF Industries “determinative” of the question here, Norfolk Southern, 550 F. 3d, at 1313, and Alabama agrees, Brief for Respondents 18. We think they misread that decision.
We began our analysis in ACF Industries by explaining that railroads could not challenge property tax exemptions under subsections (b)(1)-(3) — the provisions of §11501 specifically addressing property taxes. As noted earlier, subsections (b)(1) — (3) prohibit a State from imposing higher property tax rates or assessment ratios on “rail transportation property” than on “other commercial and industrial property.” The statute defines “commercial and industrial property” as including only “property . . . subject to a property tax levy.” § 11501(a)(4). We interpreted that phrase to mean “property that is taxed,” rather than property that is potentially taxable. 510 U. S., at 341-342. As a result, we determined that exempt (i. e., non-taxed) property fell outside the category of “other commercial and industrial property” against which the taxation of railroad property is measured. Ibid. The conclusion followed: Subsections (b)(1)-(3) permitted States to impose property taxes on railroads while exempting other entities. Ibid.
And because that was so, we stated, still another conclusion followed: Subsection (b)(4)’s prohibition on discrimina *291 tion likewise could not encompass property tax exemptions. Id., at 343. We viewed this holding as a matter of simple deduction: “It would be illogical to conclude that Congress, having allowed the States to grant property tax exemptions in subsections (b)(1)-(3), would turn around and nullify its own choice in subsection (b)(4).” Ibid. Or stated otherwise: “[RJeading subsection (b)(4) to prohibit what” other parts of the statute were “designed to allow” would “subvert the statutory plan” and “contravene the 'elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.’” Id., at 340. The structure of § 11501 thus compelled otar conclusion that property tax exemptions — even if “a variant of tax discrimination,” id., at 343 — fell outside subsection (b)(4)’s reach.
But this structural analysis — the core of ACF Industries — has no bearing on the question here. Subsections (b)(1)-(3) specifically address — and allow — property tax exemptions. But neither those subsections nor any other provision of the 4-R Act speaks to wow-property tax exemptions like those at issue in this case. Congress has expressed no intent to “allo[w] the States to grant” these exemptions. Ibid. Reading subsection (b)(4) as written — to encompass non-property tax exemptions — therefore poses no danger of “nullify[ing]” a congressional policy choice or otherwise “subvert[ing] the statutory plan.” Id., at 340, 343. To the contrary: Giving subsection (b)(4) something other than its ordinary meaning, absent any structural reason to do so, would itself contravene the expressed will of Congress.
Implicitly acknowledging that ACF Industries’ central theory is irrelevant here, Alabama focuses on what that decision called “[o]ther considerations reinforcing]” its structural analysis. Id., at 343. Most notably, Alabama underscores the following sentence from ACF Industries: “Given the prevalence of property tax exemptions when Congress enacted the 4-R Act, [§11501’s] silence on the subject — in light of the explicit prohibition of tax rate and assessment *292 ratio discrimination — reflects a determination to permit the States to leave their exemptions in place.” Id., at 344. Alabama asserts that this statement “holds just as true” for sales and use taxes. Brief for Respondents 41.
That claim rings hollow. To be sure, ACF Industries noted that Congress had declined to speak “with any degree of particularity to” the permissibility of property tax exemptions, even though States often granted them. 510 U. S., at 343. But we thought that fact relevant only because Congress had spoken with particularity in proscribing other forms of discriminatory property taxes. The very sentence Alabama highlights makes our reasoning clear: Congress’s silence as to the practice of granting property tax exemptions reflected its acquiescence in that practice “in light of the explicit prohibition [in subsections (b)(1)-(3)] of [property] tax rate and assessment ratio discrimination.” Id., at 344 (emphasis added). If that explicit prohibition had not existed — if § 11501(b) had consisted only of subsection (b)(4)’s broad ban on tax discrimination — we could not have gleaned what we did from congressional silence. After all, the very purpose of a catch-all provision like subsection (b)(4) is to avoid the necessity of listing each matter (here, each kind of tax discrimination) falling within it. And with respect to non-property taxes (like Alabama’s sales and use taxes), subsection (b)(4) is all there is. So here again, our analysis in ACF Industries does not apply because it rested on subsections (b)(1)-(3) — that is, on the highly reticulated scheme in the 4-R Act relating solely to property taxes.
Alabama also emphasizes our statement in ACF Industries that “ ‘ [principles of federalism’ ” supported our holding, Brief for Respondents 41-43 (quoting 510 U. S., at 345), but this final effort to borrow from that decision’s analysis similarly fails. We indeed recognized in ACF Industries that the 4-R Act limits the traditional taxing power of the States. Because that is so, we expressed “hesitan[ce] to extend the statute beyond its evident scope.” 510 U. S., at 345. *293 But here, for all the reasons already noted, we are not “extending] the statute”; we are merely giving effect to its clear meaning. To reiterate: The 4-R Act distinguishes between property taxes and other taxes. Congress expressed its intent to insulate property tax exemptions from challenge; against that background, ACF Industries stated that permitting such suits would intrude on the States' rightful authority. By contrast, Congress drafted § 11501 to enable railroads to contest all other tax exemptions; and when Congress speaks in such preemptive terms, its decision must govern. Principles of federalism cannot narrow §11501’s clear scope. See, e. g., CSX Transp., Inc. v. Georgia State Bd. of Equalization, 552 U. S. 9, 20 (2007) (rejecting the idea that federalism principles preclude challenges to state valuation methodologies when § 11501 “clearly authorized” such actions). Nothing in ACF Industries suggested otherwise.
B
Alabama additionally makes a subtler argument involving ACF Industries. Given that decision, Alabama contends, a ruling in CSX’s favor here would create troubling inconsistencies. Alabama claims that subsection (b)(4)’s singular prohibition on “discriminat[ion]” would then mean one thing for property taxes (according to ACF Industries) and another for non-property taxes, even though nothing in the statute supports “morphing definitions.” Brief for Respondents 32. And still worse than the difference in meaning would be the difference in result: A ruling for CSX, Alabama argues, would give railroads more protection against non-property taxes than against property taxes, even though no good reason exists for this distinction.
Alabama's one-word-two-meanings argument collapses because it again rests on a misunderstanding of ACF Industries. That decision did not define “discriminate] ” or say that a tax exemption could not fall within that term. Quite to the contrary: As noted earlier, ACF Industries frankly *294 acknowledged that tax exemptions, including property tax exemptions, “could be a variant of tax discrimination.” 510 U. S., at 343; supra, at 287-288. We held that property tax exemptions were immune from challenge under subsection (b)(4) for structural, rather than linguistic, reasons. Even assuming these exemptions “discriminate^],” they did so in a way that the specific provisions of §§ 11501(b)(1)-(3) allow, and accordingly §11501(b)(4)’s prohibition could not include them. That reasoning, once more, does not apply here, because subsections (b)(1)-(3) do not permit — indeed, in no way address — non-property tax exemptions. We therefore do not adopt a new definition of “discriminate” in this case; in the context of the 4-R Act, that word has, and has always had, just one meaning.
What remains is Alabama’s complaint that a ruling in CSX’s favor, when combined with our decision in ACF Industries, will result in divergent treatment of property and non-property taxes. At times, Alabama dresses up this objection in Latin: It contends that the canon of ejusdem gene-ris, which “limits general terms [that] follow specific ones to matters similar to those specified,” Gooch v. United States, 297 U. S. 124, 128 (1936), has a role to play in interpreting § 11501(b). More particularly, Alabama contends that this canon supports reading into § 11501(b)(4) every limitation contained in §§ 11501(b)(1) — (3), including the exclusion of tax exemptions from the class of state actions subject to challenge. See Brief for Respondents 26-27. That interpretive move, Alabama rightly notes, would ensure equal treatment of property tax and non-property tax exemptions.
But we think ejusdem generis is not relevant here. As an initial matter, subsection (b)(4), “[although something of a catchall, ... is not a general or collective term following a list of specific items to which a particular statutory command is applicable (e. g., ‘fishing rods, nets, hooks, bobbers, sinkers, and other equipment’).” United States v. Aguilar, 515 U. S. 593, 615 (1995) (Scalia, J., concurring in part and dissenting *295 in part). Rather, that subsection is “one of... several distinct and independent prohibitions.” Ibid. Related to this structural point is a functional one. We typically use ejus-dem generis to ensure that a general word will not render specific words meaningless. E. g., Circuit City Stores, Inc. v. Adams, 532 U. S. 105, 114-115 (2001); see 2A N. Singer, Sutherland on Statutes and Statutory Construction §47:17 (7th ed. 2007). But that concern is absent here. Reading subsection (b)(4) to cover non-property tax exemptions will not deprive subsections (b)(1)-(3) of effect, because those subsections are addressed only to property taxes. A canon meaning literally “of the same kind” has no application to provisions directed toward dissimilar subject matter.
The better version of Alabama’s claim reads entirely in English; it is simply that distinguishing between property tax exemptions and other tax exemptions makes not a whit of sense. We are not much inclined to disagree. Neither CSX nor the United States as amicus curiae has offered a satisfying reason for why Congress drew this line — why in §§ 11501(b)(l)-(3) it barred challenges based on property tax exemptions, but then turned around in § 11501(b)(4) to allow challenges based on, say, excise tax exemptions. See Tr. of Oral Arg. 4-5, 24-25. CSX, for example, has not presented any evidence that different tax exemptions posed different levels of threat to railroads’ financial stability. So even if Congress had a good reason for distinguishing between property and non-property tax exemptions, we acknowledge that it eludes us.
But this admission does not take us far in Alabama’s direction. Even if the 4-R Act were ambiguous, we doubt we would interpret subsection (b)(4) to replicate each facet of subsections (b)(l)-(3). Treating property tax exemptions and other tax exemptions equivalently might make sense, as Alabama argues. But so too might allowing railroads to challenge all taxes (property or non-property) that contain exemptions. After all, as we noted earlier, tax exemptions *296 are an obvious form of tax discrimination. See supra, at 287-288. It is hardly self-evident why Congress would prohibit a State from charging a railroad a 4% tax and a competitor a 2% tax, but allow the State to charge the railroad a 4% tax and the competitor nothing. The latter situation would frustrate the purposes of the Act even more than the former. In ACF Industries, we accepted that anomaly because the terms and structure of the Act demanded that we do so. But we could say no more in favor of the result than that it was “not so bizarre that Congress could not have intended it.” 510 U. S., at 347 (internal quotation marks omitted). That was not a glowing recommendation, and we see no reason today to view the matter differently. Accordingly, even assuming that statutory ambiguity permitted us to do so, we would hesitate to extend the distinction between tax exemptions and differential tax rates in order to avoid a distinction between property and non-property taxes. That would seem a poor trade of statutory anomalies.
In any event, and more importantly, the choice is not ours to make. Congress wrote the statute it wrote, and that statute draws a sharp line between property taxes and other taxes. Congress drafted §§ 11501(b)(1) — (3) to exclude tax exemptions from the sphere of prohibited property tax discrimination. But it drafted § 11501(b)(4) more broadly, without any of the prior subsections’ limitations, to proscribe other “tax[es] that discriminat[e],” including through the use of exemptions. That congressional election settles this case. Alabama’s preference for symmetry cannot trump an asymmetrical statute. And its preference for the greatest possible latitude to levy taxes cannot trump Congress’s decision to restrict discriminatory taxation of rail carriers.
IV
Our decision in this case is limited. We hold that CSX may challenge Alabama’s sales and use taxes as “tax[es] that discriminat[e] against. . . rail carrier[s]” under § 11501(b)(4). *297 We do not address whether CSX should prevail in that challenge — whether, that is, Alabama’s taxes in fact discriminate against railroads by exempting interstate motor and water carriers. Alabama argues, in support of barring CSX’s challenge at the outset, that this inquiry into discrimination may pose difficulties. Brief for Respondents 35-37. We cannot deny that assertion, but neither can we respond to it by precluding CSX’s claim. Discrimination cases sometimes do raise knotty questions about whether and when dissimilar treatment is adequately justified. In the context of the 4-R Act, those hard calls can arise when States charge different tax rates to different entities in a practice the statute specifically subjects to challenge. See § 11501(b)(3). So too, difficult issues can emerge when, as here, States provide certain entities with tax exemptions. In either case, Congress has directed the federal courts to review a railroad’s challenge; and in either case, we would flout the congressional command were we to declare the matter beyond us.
For the reasons stated, we reverse the judgment of the Eleventh Circuit and remand the case for further proceedings consistent with this opinion.

It is so ordered.

 This provision was originally codified at 49 U. S. C. § 26c (1976 ed.). In 1978, Congress recodified it at § 11503 (1976 ed., Supp. II), with slightly altered language but “without substantive change,” §3(a), 92 Stat. 1466. In 1995, Congress again recodified the section without substantive change, this time at 49 U. S. C. § 11501. This opinion refers to the statute’s current text.

 The first sentence of subsection (c) provides: “Notwithstanding section 1341 of title 28 ... a district court of the United States has jurisdiction ... to prevent a violation of subsection (b) of this section.” The next sentence concerns the relief available for violations of §§ 11501(b)(1) and (2): “Relief may be granted under this subsection only if the ratio of assessed value to true market value of rail transportation property exceeds by at least 5 percent the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction.”

 State law provides that motor carriers need not pay sales or use taxes on diesel fuel so long as they pay a different excise tax of $0.19 per gallon. Ala. Code §40-17-2(1) (2003) (primary tax of $0.13 per gallon); §40-17-220(e) (2010 Cum. Supp.) (additional tax of $0.06 per gallon). State law wholly exempts interstate water carriers from sales and use taxes on diesel fuel. § 40-23-4(a)(10); §40-23-62(12). Nor do these water carriers pay any other tax on the fuel they purchase or consume. Brief for Respondents 16.

 Compare Norfolk Southern R. Co. v. Alabama Dept. of Revenue, 550 F. 3d 1306, 1316 (CA11 2008), and Atchison, T. & S. F. R. Co. v. Arizona, 78 F. 3d 438, 443 (CA9 1996) (rejecting a railroad’s challenge to a use tax that exempted motor carriers), with Burlington N., S. F. R. Co. v. Lohman, 193 F. 3d 984, 986 (CA8 1999) (entertaining a challenge to a sales and use tax that exempted rail carriers’ competitors), Burlington Northern R. Co. v. Commissioner of Revenue, 606 N. W. 2d 54, 58-59 (Minn. 2000) (same), and Atchison, T. & S. F. R. Co. v. Bair, 338 N. W. 2d 338, 348 (Iowa 1983) (same).

 We consider here only questions relating to whether CSX can bring a claim for discrimination based on the State’s pattern of tax exemptions. We do not consider any issues concerning whether these exemptions actually discriminate against CSX. See infra, at 288, n. 8, and 297. Alabama has raised two such issues in this Court. First, Alabama contends that in deciding CSX’s claim, a federal court must consider not only the specific taxes challenged, but also the broader tax scheme. Brief for Respondents 58-60. Second, the State argues that the court must compare the taxation of CSX not merely to direct competitors but to other commercial entities as well. Id., at 48, n. 7. Most of the dissenting opinion is devoted to supporting the State’s argument on this second question. But we leave these and all other issues relating to whether Alabama actually has discriminated against CSX to the trial court on remand to address as and when it wishes. No court in this ease has previously considered these questions, and the parties’ briefs in this Court have only sketchily addressed them. In addition, the parties dispute whether Alabama waived its claim on the second issue by initially agreeing that “the comparison class consists of motor carriers and water carriers,” App. to Pet. for Cert. 12a (internal quotation marks omitted), and proceeding with the litigation on that basis. We think this question of waiver is also best considered by the trial court.

 As originally enacted, the provision that is now 49 U. S. C. § 11501(b)(4) prohibited the imposition of “any other tax” that discriminates against a railroad. §26c (1976 ed.). The substitution of “another tax” occurred when Congress first recodified the Act. In line with Congress’s statement that revisions made at that time should not be construed as having substantive effect, see n. 1, supra, we treat the two terms as synonymous.

 Alabama also invokes the remedial provision of subsection (c), n. 2, supra, to urge that we read § 11501 as effectively limited to property or “in lieu” taxes. According to Alabama, that provision entitles federal courts to grant relief only when States overvalue railroad property under subsections (b)(1) and (b)(2): Federal courts, the State avers, “have no power to enjoin the granting of tax exemptions as a violation of subsection *286 (b)(4), or, apparently [to remedy] any violation of subsection (b)(4).” Brief for Respondents 37. But that interpretation of subsection (c)’s remedial provision cannot be right, because it would nullify subsection (b)(4) (and, for that matter, subsection (b)(3) as well). We understand subsection (c)'s remedial provision neither as limiting the broad grant of jurisdiction to federal courts to prevent violations of subsection (b) nor as otherwise restricting the scope of that subsection. The remedial provision simply limits the availability of relief when a State discriminates in assessing the value of railroad property, as proscribed by subsections (b)(1) and (b)(2). That kind of discrimination is not at issue here.

 This conclusion does not, as Alabama and the dissent contend, turn railroads into “most-favored-taxpayers,” entitled to any exemption (or other tax break) that a State gives to another entity. See Brief for Respondents 23; post, at 305 (opinion of Thomas, J.). We hold only that § 11501(b)(4) enables a railroad to challenge an excise or other non-property tax as discriminatory on the basis of the tax scheme’s exemptions — as the dissent apparently agrees, post, at 297. Whether the railroad will prevail — that is, whether it can prove the alleged discrimination — depends on whether the State offers a sufficient justification for declining to provide the exemption at issue to rail carriers. See supra, at 286; Brief for United States as Amicus Curiae 25-26; Richmond, F. & P. R. Co. v. Department of Taxation of Va., 762 F. 2d 375, 380-381, and *289 n. 4 (CA4 1985). So if, to use the dissent’s example, a railroad challenged a scheme in which “every person and business in the State of Alabama paid a $1 annual tax, and one person was exempt,” post, at 305, for some reason having nothing to do with railroads, we presume the suit would be promptly dismissed. Nothing in this application of § 11501(b)(4) offers a “windfall” to railroads. Ibid.
The dissent argues in addition that a State should prevail against any claim of discrimination brought under subsection (b)(4) if it can demonstrate that a tax does not “target” or “single out” a railroad, post, at 297, 300; that showing, without more, would justify the tax (although the dissent declines to say just what it means to “target,” post, at 303, n. 3). This argument primarily concerns the question whether Alabama’s tax scheme in fact discriminates under subsection (b)(4) — a question we have explained is inappropriate to address, see n. 5, supra. We note, however, that the dissent’s argument about subsection (b)(4) rests entirely on the premise that subsections (b)(1) — (3) prohibit only property taxes that “target” or “single out” railroads, see post, at 300; so, the dissent would say, a State may impose a 4% property tax on railroads (assuming some unspecified number of other taxpayers also pay that rate) while levying only a 2% property tax on railroad competitors. But we have never decided, in ACF Industries or any other case, whether subsections (b)(1) — (3) should be interpreted in this manner. And even accepting the dissent’s unexplained premise, a serious question would remain about whether to transplant this construction of subsections (b)(1) — (3) to subsection (b)(4)’s very different terrain, see infra, at 294-296.